IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 09-cv-01902-PAB

CROSS MOUNTAIN RANCH LIMITED PARTNERSHIP,

    Plaintiff,

v.

TOM VILSACK, in his official capacity as
Secretary of the United States Department of Agriculture, *et al.*,

    Defendants.

---

## ORDER

---

    Plaintiff Cross Mountain Ranch Limited Partnership has held a permit to graze sheep on seven allotments[1] in the Williams Fork area since 1993.  The Williams Fork area falls within the Yampa Ranger District of Routt National Forest in Colorado.  Before July 25, 2008, plaintiff was allowed to graze 7,000 ewes with lambs between July 1 and September 1 each year.  On January 16, 2007, the United States Forest Service ("Forest Service"), through defendant Oscar P. Martinez, the District Ranger, notified plaintiff that the Forest Service was beginning an assessment of a proposal that the district revise its management of livestock grazing so as to comport with the Routt National Forest Land and Resource Management Plan.  Ultimately, the Forest Service revised the management of livestock grazing in the Williams Fork area, implementing an Adaptive Management Plan ("AMP") for the allotments, one result of which was a

---

[1] "An allotment is a designated area of land available for livestock grazing." 36 C.F.R. § 222.1(b)(1).

reduction in plaintiff's permitted number of livestock by 2,000 ewes with lambs.

Plaintiff initiated this action pursuant to, *inter alia*, the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, challenging the decision by the Forest Service to alter the management of livestock grazing in the Williams Fork area. *See* Docket No. 1. Defendants have filed the administrative record with the Court, *see* Docket Nos. 10, 25-1, and the parties have fully briefed the issues. The Court exercises jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

## I. STANDARD OF REVIEW

Pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, the Court must determine whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of this review is narrow. *See Colorado Wild, Heartwood v. U.S. Forest Service*, 435 F.3d 1204, 1213 (10th Cir. 2006) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "An agency's decision is arbitrary and capricious if the agency (1) 'entirely failed to consider an important aspect of the problem,' (2) 'offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' (3) 'failed to base its decision on consideration of the relevant factors,' or (4) made 'a clear error of judgment.'" *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 704 (10th Cir. 2009) (citation omitted). When reviewing an agency's factual determinations, the Court

"ask[s] only whether the agency took a 'hard look' at information relevant to the decision." *Id.*

"In addition to requiring a reasoned basis for agency action, the 'arbitrary or capricious' standard requires an agency's action to be supported by the facts in the record." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994). An agency's decision, therefore, is arbitrary if not supported by "substantial evidence." *Id.* "Evidence is substantial in the APA sense if it is 'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact.'" *Id.* (citation omitted).

A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action. *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008). The deference given to an agency action "is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise." *Utah Environmental Congress v. Dale Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006).

**II. DISCUSSION**

    **A.  Consideration of Alternatives**

Plaintiff argues that the Forest Service failed to consider certain reasonable alternatives to the livestock grazing reduction that was included in the AMP adopted by the Forest Service. The Forest Service compared three alternatives in the Environmental Assessment ("EA"),[2] namely (1) abolishing grazing altogether, (2)

---

    [2]"Environmental Assessment:
        (a) Means a concise public document for which a Federal agency is

3

continuing with the present management approach, and (3) implementation of the AMP. In addition to these alternatives, plaintiff argues that the Forest Service should have considered both range improvements and site-specific measures as opposed to uniform reductions in the permitted number of livestock. The Forest Service contends that plaintiff waived this challenge by failing to exhaust it during the administrative proceedings and that, in any event, it considered a range of reasonable alternatives, including those approaches identified by plaintiff.

On the question of waiver, "[p]ersons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." *Department of Transp. v. Public Citizen*, 541 U.S. 752, 764 (2004) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 553 (1978)). "[C]laims cannot be 'only vaguely and cryptically referred to, if at all, during the administrative appeal.'" *The Ark Initiative v. U.S. Forest Service*, 660 F.3d 1256, 1261 (10th Cir. 2011) (quoting *Kleissler v. U.S. Forest Service*, 183 F.3d 196, 203 (3d Cir. 1999)). A claim must be presented "in sufficient detail to

---

        responsible that serves to:
            (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.
            (2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.
            (3) Facilitate preparation of a statement when one is necessary.
        (b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.
40 C.F.R. § 1508.9.

allow the agency to rectify the alleged violation." *Forest Guardians v. U.S. Forest Service*, 495 F.3d 1162, 1170 (10th Cir. 2007). It is not sufficient for plaintiff to "merely mention broad categories of potential impacts with little or no analysis." *The Ark Initiative*, 660 F.3d at 1262.

A review of the record reveals that plaintiff preserved its current claim that the Forest Service failed to adequately address reasonable alternatives. In the Notice of Appeal, plaintiff included a section entitled "The Environmental Assessment Failed to Evaluate All Reasonable Alternatives." AR at 7504.[3] In that section, plaintiff argues, *inter alia*, that the Forest Service "did not give priority to rangeland improvement projects and land treatments, such as fencing, vegetation manipulation, planting vegetation, or prescribed fires, which offer the best opportunity for achieving the standards and guidelines without draconian reductions in permitted livestock grazing use." *See* AR at 7511 (emphasis omitted). The Forest Service responded to that argument. *See* AR at 7866-7867. Earlier in the administrative process, plaintiff provided comments on the Draft EA that included its belief that the Draft EA lacked "[a]nalysis and discussion of alternatives such as fencing, rehabilitation, plant manipulation, planting, prescribed burns, water developments, and mechanical or chemical treatments." AR at 7421. Plaintiff's comments on the Draft EA also argued that the Forest Service's plan "should include the identification of localized impact areas." AR at 7390 ("Once these areas are identified the District and Cross Mountain Ranch should consult with regard to ways of achieving objectives in these areas

---

[3]The Court has used the abbreviation "AR" when citing the Administrative Record in this case.

through combination of methods and approaches including avoidance or reduced intensity.").[4]  Because plaintiff raised the present arguments during the appellate process, the Court turns to the merits of its claim that defendants failed to consider reasonable alternatives.

The Forest Service was required to "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R § 1502.14(a).  As part of this analysis, the Forest Service, in addition to any other reasonable alternatives, needed to "identify and analyze its preferred alternative, as well as a null or 'no action' alternative that would occur if the agency elected to maintain the current state of affairs unchanged." *Colorado Environmental Coalition v. Salazar*, --- F. Supp. 2d ----, 2012 WL 2370067, at *7 (D. Colo. June 22, 2012) (citing 40 C.F.R. § 1502.14).  However, "[n]o specific number of alternatives is required or prescribed." AR at 3067 (National Environmental Policy Act Handbook).

When assessing an agency consideration of alternatives, the Court must apply a "rule of reason." *New Mexico ex rel. Richardson*, 565 F.3d at 709.

> The reasonableness of the alternatives considered is measured against two guideposts.  First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate.  Second, reasonableness is judged with reference to an agency's objectives for a particular project.

---

[4]The Forest Service contends that range improvements and site-specific measures are not "alternatives," but rather are aspects of the AMP that was adopted. *See* Docket No. 26 at 34, 40.  That argument, however, begs the question, as plaintiff contends that sufficient range improvements and site-specific measures might have been adequate to achieve the goal of the plan without the livestock grazing reduction.

*Id.* (citations omitted).

Here, plaintiff argues that, "[d]uring the planning process, [it] advocated for two additional reasonable management alternatives which the [Forest Service] should have analyzed in detail." Docket No. 21 at 21. First, plaintiff advocated for consideration of range improvements. The regulations define "range improvements" as

> any activity or program designed to improve production of forage and includes facilities or treatments constructed or installed for the purpose of improving the range resource or the management of livestock and includes the following types:
> (i) Non-structural which are practices and treatments undertaken to improve range not involving construction of improvements.
> (ii) Structural which are improvements requiring construction or installation undertaken to improve the range or to facilitate management or to control distribution and movement of livestock.
> (A) Permanent which are range improvements installed or constructed and become a part of the land such as: dams, ponds, pipelines, wells, fences, trails, seeding, etc.
> (B) Temporary which are short-lived or portable improvements that can be removed such as: troughs, pumps and electric fences, including improvements at authorized places of habitation such as line camps.

36 C.F.R. § 222.1(b)(21). The record clearly reveals that the Forest Service addressed range improvements during the administrative process. *See* AR at 7298.[5] Plaintiff,

---

[5]The EA provides as follows:
Under this alternative no new improvements are identified. However, if improvement needs are identified at later time to help control livestock and assist the permittees to meet the allowable use or other design criteria they could be constructed following compliance with NEPA and other laws and regulations. Any new improvements would be constructed as funding allows. Pursuant to Term Grazing Permit, Part 2 Clause 8(h), "[t]he permittee will pay the cost or perform or otherwise provide for the proportionate share of the cooperative improvements and management practices in the permitted area . . ." Permittee cooperation on improvement construction would be encouraged with the goal of a 50-50 split between Forest Service and permittee. Permittee contributions may be by individual project or across multiple projects on the allotment. Permittee participation

however, contends that they must have been considered, apart from other factors impacting rangeland management, as an alternative to the livestock grazing reduction. But plaintiff does not explain why the consideration of range improvements needs to take any particular form, i.e., that the Forest Service was required to consider range improvements as a separate alternative to any of the other measures considered. Furthermore, pursuant to the AMP, range improvements can still be incorporated to the extent they are determined necessary over time, as can adjustments to the amount and manner of permissible livestock grazing. Pursuant to adaptive management techniques, "[s]pecific actions are prescribed for each allotment that provide[] the ability to change management over time, within established constraints, based on analysis of results from monitoring."  AR at 7296.

Plaintiff believes that the Forest Service failed to consider site-specific alternatives to the "blanket reduction" in livestock grazing. The AMP incorporates many site-specific considerations. *See* AR at 7303-7307 (outlining the "Actions Specific to Allotments"). And, as noted above, while the total permitted number of livestock was reduced, the AMP allows for adjustments as conditions warrant. The EA provides that the "adaptive management principles . . . give the permittee the flexibility to work with the authorized officer to choose the best way to consistently meet the allowable use

---

    is not mandatory. Permittees would, however, be made aware of the effects of nonparticipation including the possibility of reduction in permitted numbers and/or season of use if allowable use cannot be consistently met . . . Fences will be designed to accommodate big game movements. Maintenance of all new improvements would be assigned to the permittee through the Term Grazing Permit.

AR at 7298.

criteria within the needs of his/her overall livestock operation." AR at 7317; *cf.* AR at 7349-7350 ("The adaptive management approach will ensure that timing, intensity (utilization levels), duration and frequency of permitted grazing activities on the lower gradient riparian areas are consistent with plant physiological needs so the high seral native species (willows, sedges, grasses) specific to riparian and wetland conditions increase in composition and cover appropriate to the current site potential. In addition, it will ensure that timing, intensity, duration and frequency of livestock use are commensurate with maintenance of riparian and upland health and soil condition.").

Upon review of plaintiff's arguments, they do not turn so much on the Forest Service's failure to consider range improvements or site-specific management techniques. Rather, plaintiff believe that those specific factors should have been considered as alternatives to the reduction in permissible livestock. The law requires that the Forest Service consider reasonable alternative measures for achieving the objective of the project. As cited by plaintiff, the "stated objective of this project was 'to provide forage for permitted domestic livestock grazing in a manner that maintains or moves conditions toward achieving [] objectives and desired conditions." Docket No. 30 at 17 (citing AR at 7279 (EA)). Plaintiff does not explain why, as part of its consideration of alternative approaches for achieving this objective, the Forest Service was required to isolate certain aspects of the AMP as potential alternatives to the livestock grazing reduction. What is clear from the record is that the Forest Service did in fact consider alternatives to the livestock reduction: one of which was eliminating all livestock grazing and the other was maintaining the current grazing management approach. The Forest Service was not required to consider any particular number or

combination of alternatives, isolating any possible action as compared to the blanket reduction of livestock.[6] Plaintiff "adamantly sought *any alternative* other than the blanket reduction in permitted livestock grazing use, in order to achieve the stated objective," Docket No. 30 at 17 (emphasis in original), which only emphasizes this weakness in its argument.

Plaintiff commented during the administrative proceedings that it agreed with the Forest Service that continued livestock grazing with improvements in adaptive management was the appropriate course of action. *See* AR at 7386-7387. Plaintiff "respectfully suggest[ed] that the primary objectives of the [Forest Service] can be achieved and the concerns of all parties balanced by implementation in a slightly different configuration than that conceptualized and preliminarily proposed in the Draft Environmental Assessment." AR at 7387. The Forest Service, however, was not required to "consider an alternative unless it is significantly distinguishable from the alternatives already considered." *New Mexico ex rel. Richardson*, 565 F.3d at 708-09. Here, the Forest Service's alternatives reveal an appropriate consideration of the need to balance "the concerns of all parties" in order to meet what appears to be largely shared goals. The Forest Service considered banning grazing, continuing the same amount of grazing, and implementing improved adaptive management techniques along

---

[6]*See Salazar*, 2012 WL 2370067, at *7 ("[T]he phrase "all other reasonable alternatives" is not entirely open-ended. To define the boundaries of the range of alternatives that must be considered, the agency must first define the objectives of the proposed action, a task in which the agency enjoys considerable discretion. Once the objective of the action is established, the agency may proceed to reject or abandon alternatives that are too remote, speculative, impractical, or ineffective in achieving the stated objective.") (citations omitted).

with some reduction in livestock grazing.  It further considered, but eliminated from detailed study, an "alternative that would have combined three allotments and resulted in a reduction of three thousand ewes from the analysis area."  AR at 7286.  "This alternative was not studied further due to the impact that the [interdisciplinary team] felt would occur to the [plaintiff] from this reduction."  *Id.*  In sum, plaintiff has failed to show that the Forest Service did not consider an appropriate range of reasonable alternatives for achieving the stated objective.

### B.  Reliance on Monitoring Data and Insufficient Samples

Plaintiff argues that, in assessing the condition of the rangeland, the Forest Service improperly calculated and evaluated range data.  The Forest Service collected data pursuant to the Rangeland Analysis and Management Training Guide for cover-frequency transects (the "Training Guide").[7]  *See* Docket No. 21 at 31.  Plaintiff contends that the Training Guide "requires a comparison, or 'similarity coefficient,' between the existing plant community and the potential natural community or desired plant community," *id.* at 32, and that the Forest Service materially departed from the Training Guide by failing to make "similarity coefficient" comparisons.  *See id.* at 33.  Plaintiff further argues that the Forest Service did not analyze a statistically significant number of plant samples.  *Id.* at 33-34.  The Forest Service asserts that plaintiff waived these arguments by failing to adequately raise them during the administrative

---

[7]The "cover-frequency method" of monitoring and inventorying rangeland conditions is discussed below in Section II.C.

proceedings.[8]

Within its Notice of Appeal, plaintiff was required to include a "statement of the facts of the dispute and the issue(s) raised by the appeal." 36 C.F.R. § 251.90(b)(5). Plaintiff admits that its "objections regarding the similarity coefficient was not clearly raised in its notice of appeal." Docket No. 30 at 20. In fact, plaintiff did not raise the similarity coefficient argument at all in the 44-page Notice of Appeal.[9] Nor did plaintiff argue in its Notice of Appeal that the analysis relied on too few plant samples.

Once a party identifies the specific issues in its Notice of Appeal, a Deciding Officer will draft a "responsive statement" addressing "the specific facts or issues of law or regulation and the requested relief set forth by the appellant in the notice of appeal." 36 C.F.R. § 251.94(a). In this case, the "responsive statement" addressed plaintiff's "Appeal Points" in turn. *See* AR at 7858-7882. A review of the "responsive statement" reveals that the Deciding Officer did not believe that plaintiff was arguing that a "similarity coefficient" calculation or additional plant species analysis was required.

The party appealing an agency decision may file a reply to the responsive statement. *See* 36 C.F.R. § 251.94(c). Plaintiff did argue in its reply brief that the Forest Service failed to calculate similarity coefficients and relied only on the two most

---

[8]The Forest Service further contends that, in any event, it did not materially depart from the requirements of the Training Guide and did analyze a sufficient number of plant samples.

[9]Plaintiff points out, however, that the notice of appeal attached a declaration by its range expert Todd D. Graham stating that "[u]se of the Cover-Frequency Transect method . . . requires computation of similarity coefficients." Docket No. 30 at 20-21 (quoting AR at 7837). The Court rejects the argument that any reference to an issue within one of many exhibits attached to a lengthy Notice of Appeal is sufficient, on its own, to preserve the argument for appeal.

dominant plant species in conducting its analysis. *See* AR at 7888.[10]  Plaintiff, however, did not alert the Deciding Officer that the "responsive statement" improperly failed to address issues raised in its Notice of Appeal.  Rather, plaintiff now characterizes these arguments as a reply to the Deciding Officer's assertion in the responsive statement that the "'data was interpreted and analyzed utilizing the best available science,' including a comparison between the plant species listed on the transect records based on dominance and a desired plant community."  Docket No. 30 at 21 (quoting AR at 7873).  Plaintiff fails to persuasively explain why this general language in the responsive statement permitted it to introduce new issues of concern in its reply brief or obligated the administrative decision maker to address the issues when rendering a decision on the Notice of Appeal.  Contrary to plaintiff's characterization of that decision, there is no indication that the arguments regarding the similarity coefficient or the number of plant species analyzed were or should have been considered.  *See U.S. v. Abrahamsen*, 2007 WL 1071926, at *3 (D. Mont. April 4, 2007) ("Exhaustion requires, in part, that Tin Cup provide a written notice of appeal stating the law, regulation, or policy it believes the Forest Service violated. Tin Cup points to no such written notice prior to its filing of

---

[10]Plaintiff points out that these issues were discussed at a hearing conducted during the administrative appeal, *see* AR at 7923, but cites no authority for the proposition that raising issues in that context is sufficient exhaustion.  *See Kleissler v. U.S. Forest Service*, 183 F.3d 196, 202 (3d Cir. 1999) ("Kleissler specifically asks us to consider the audiotaped discussions held during the informal disposition meetings. The statute simply does not permit us to do that.").  And, while plaintiff is correct that the reply brief is part of the "appeal record," *see* 36 C.F.R. § 251.98(b), 251.99(a), the administrative decision maker in this case, Phil Cruz, Deputy Forest Supervisor, only "respond[ed] to each of the [plaintiff's] [i]ssues raised in the September 5 Appeal." AR at 7899.  There is no indication in the record that plaintiff ever notified the Forest Service during the administrative proceedings that it had failed to address a properly raised issue.

13

its amended counterclaim, and thus, the exhaustion requirement has not been satisfied.").

In sum, plaintiff attempted to raise a wholly new issue in its reply and failed to adequately alert the Deciding Officer of that fact.  Because plaintiff did not present those arguments in a form that would adequately bring them to the agency's attention and has not argued that the issues are "obvious," *see Forest Guardians*, 495 F.3d at 1170, the Court concludes that plaintiff did not adequately exhaust the arguments that the Forest Service failed to calculate similarity coefficients and improperly relied upon only two plant species in its analysis.  The Court, therefore, will not consider them.

### C. Minimum Number of Transects and Trend Data

Defendant used the "cover-frequency method," which "is the standard method for rangeland inventory" and "also the standard for monitoring changes in canopy cover and frequency of herbaceous species."  AR at 2506 (Ex. CF to the Forest Service Training Guide).  The Training Guide provides that this "method provides estimates of canopy cover by species frequency ground cover and production by life form through replicated sampling of plot frame transects."  *Id.*  Plaintiff argues that the Forest Service did not comply with prescribed procedures for conducting that particular method.  The Training Guide states that the "[c]over-frequency . . . method[] require[s] [a] minimum of two transects per site for inventory and three transects for monitoring."  AR at 2637.  The Forest Service states that the data was being used for monitoring, but that it failed to use at least three transects at any of the sites.

The Training Guide makes clear that not "all data and information collected by the agency can be statistically defensible."  AR at 2636.  It states that "[t]here is simply

14

not sufficient funding, nor is it necessary to collect all information in this manner." *Id.* Therefore, "[p]rior to inventory or monitoring activities managers should decide what level of reliability they want for their study and then design the sampling methods to achieve that level of reliability." *Id.* Therefore, the Court interprets the Training Guide as providing the minimum number of transects as guides for conducting statistically defensible analysis. Thus, the failure to use three transects is not, *per se*, a violation of the Forest Service's rules.[11]

Plaintiff, however, contends that, "[i]n addition to the foregoing, . . . the range study methods implemented by the [Forest Service] are incapable of yielding accurate information" regarding trends. Docket No. 21 at 40. More specifically, plaintiff argues that, (1) in addition to relying on too few transects, the Forest Service chose poor locations for the sample sites on each allotment, (2) did not conduct the trend studies with sufficient frequency, (3) used two different approaches over time that could not be compared, and (4) did not consider the effects of drought on the range conditions.

Plaintiff's concern regarding the location of samples turns on the contention that, in regard to certain allotments, the Forest Service did not pull any of the samples from locations "beyond the well-established roads." *See, e.g.*, Docket No. 21 at 41. Plaintiff fails to demonstrate that these particular locations were unreliable, essentially implying that it is obvious that such is the case. Moreover, plaintiff was afforded the opportunity to have its own expert conduct an independent analysis. Plaintiff declined that

---

[11]*Cf.* AR at 7837 (where plaintiff's expert stated that, "[t]o the best of my knowledge [Forest Service] technicians in 2003, 2004 and 2006 properly collected data in the field using the Cover-Frequency Transect method").

opportunity and its expert relied on the Forest Service data.  The expert further opined that the "monitoring methods employed by [Forest Service] were of moderate utility in determining trend and guiding management actions."  AR at 7835.  Plaintiff does not identify authority for the proposition that greater utility was required.  The mere fact that the analysis of plaintiff's expert led to different conclusions does not undermine the Forest Service's decision.[12]  *Cf. Prairie Band Pottawatomie Nation v. Federal Highway Admin.*, 684 F.3d 1002, 1008 (10th Cir. 2012) ("[E]ven if an agency violates the APA, its error does not require reversal unless a plaintiff demonstrates prejudice resulting from the error.") (citing 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error.")).

Turning to plaintiff's argument regarding the infrequency of trend studies, plaintiff fails to address the Forest Service's contention that the Forest Service relied on other analytical tools as well to assess trend.  *See* Docket 26 at 58-59 (citing AR at 7311).  Plaintiff has not demonstrated that any infrequency between analyses raises significant concerns regarding the overall reliability of Forest Service's downward trend determinations.  Moreover, the Forest Service acknowledged the limitations of comparing data compiled from two different approaches to trend studies, but noted that such comparison still provides some indication of apparent trend.  *See* AR at 7311.[13]

---

[12]"Deference to the agency is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise." *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006).

[13]*Cf. Prairie Band Pottawatomie Nation v. Federal Highway Admin.*, 684 F.3d 1002, 1013-14 (10th Cir. 2012) ("We 'are not in a position to decide the propriety of competing methodologies in the transportation analysis context, but instead, should determine simply whether the challenged method had a rational basis and took into

Plaintiff fails to dispute this in its reply. Furthermore, as noted above, the trend determination was multi-factoral.

In regard to plaintiff's argument that the potential effects of drought were not considered, the EA includes the following: "By collecting long term data over a four year period of time, the Forest Service was able to reduce impacts from drought, insects and other factors unrelated to grazing." Docket No. 26 at 60 (citing AR at 7429). The EA further states that, "[a]s matter of record there has not been a prolonged drought[.]" AR at 7429. Plaintiff does not explain how this is consistent with its contention that drought was ignored. *See generally* Docket No. 30.[14]

---

consideration the relevant factors.'") (quoting *Comm. to Pres. Boomer Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1553 (10th Cir. 1993)).

[14]Plaintiff also argues that, upon analysis of all the data, the Forest Service concluded that there was an overall decline throughout the relevant area and, as a result, seeks to implement a "one-size-fits-all" approach but that the record actually demonstrates that any decline exhibited is limited to only certain sites. This is essentially a reassertion of plaintiff's argument the Forest Service "failed to analyze alternatives which prescribe different solutions for each of the known 'site-specific disparities' — stated another way, the Forest Service failed to consider any alternatives other than a 'one-size-fits-all' approach." Docket No. 23 at 22. As the Forest Service points out, and is discussed above, the AMP is not a "one-size-fits-all" approach. *Cf.* AR at 7317 ("The adaptive management principles . . . give the permittee the flexibility to work with the authorized officer to choose the best way to consistently meet the allowable use criteria within the needs of his/her overall livestock operation."). While plaintiff disagrees with the reduction in permissible livestock grazing that was included in that plan, it fails to persuasively articulate how in fact the plan overall does not account for site-specific differences. *Cf.* AR at 7314 (where the EA provides that maintaining the current approach, i.e., "[a]pplying the same management throughout the analysis area, without regard to the changing conditions of vegetation, would not achieve desired results"). Indeed, plaintiff does not specifically reply to the Forest Service's assertion that the approach taken is "precisely designed for site-specific management." Docket No. 26 at 62 (emphasis omitted).

### D. Achievement of Desired Result

Plaintiff's final argument is that the Forest Service did not consider whether the reduction in livestock grazing will achieve the desired result. Plaintiff contends that the record indicates that other factors are more likely causing the downward trends in the rangeland conditions and, consequently, the decision to reduce its permitted number of livestock is arbitrary and capricious. Plaintiff points out that other factors, some of which appear largely out of the control of the Forest Service, might be contributing to downward trends, but has not demonstrated that the Forest Service's decision to reduce livestock grazing as part of its efforts to improve rangeland conditions has no reasonable or plausible connection to the record evidence. *Cf. New Mexico ex rel. Richardson*, 565 F.3d at 704 ("An agency's decision is arbitrary and capricious if the agency (1) 'entirely failed to consider an important aspect of the problem,' (2) 'offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' (3) 'failed to base its decision on consideration of the relevant factors,' or (4) made 'a clear error of judgment.'"). The record reveals that the Forest Service recognized that certain factors would continue to work against improvement of conditions, even in the total absence of livestock grazing. *See, e.g.*, AR at 7313 (where the EA provides that in the absence of any livestock grazing "[w]ild ungulates will continue to impact recovery and may in places prevent or retard attainment of desired conditions"). There has been no showing, however, that it was unreasonable, based on the evidence, to conclude that the current level of grazing was at least one factor

impacting the downward trend in rangeland conditions.

## III. CONCLUSION

In a technical and scientific area within its expertise, the Forest Service reached a decision that preserved livestock grazing at significant levels, while attempting to improve overall rangeland conditions through improved management techniques. Although plaintiff would have preferred the decision be implemented "in a slightly different configuration," AR at 7387, it has failed to demonstrate that the Forest Service's action was arbitrary and capricious. Therefore, it is

**ORDERED** that the agency decision is AFFIRMED, judgment shall enter in favor of defendants, and this case shall be closed in its entirety.

DATED September 24, 2012.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge